Glenn H. MILLER, Appellant,

v.

Marian J. CLOUGH, formerly known
as Marian J. Miller, Appellee.

Marian L. Clough, formerly known
as Marian J. Miller, Appellant,

v.

Glenn H. Miller, formerly known
as Glenn J. Miller, Appellee.

Nos. S–11908, S–12108.

Supreme Court of Alaska.

Aug. 17, 2007.

Loren Domke, Loren Domke, P.C., Juneau, for Glenn Miller, Appellant/Appellee.

Deborah A. Holbrook, Juneau, for Marian Clough, Appellee/Appellant.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and BRYNER Justices.

*OPINION*

BRYNER, Justice.

# I. INTRODUCTION

This appeal requires us to interpret Alaska Civil Rule 90.3(a)(4), which allows courts to impute potential income to a voluntarily underemployed parent in calculating the parent's child-support obligation. The main issue presented is whether a divorced parent's remarriage to a person of wealth allows the new spouse's assets to be counted as potential income under this rule if the parent remains underemployed. Because Rule 90.3(a)(4) directs courts to consider only "work history, qualifications, and job opportunities" in determining how much potential income should be imputed, we conclude that the rule does not allow a new spouse's wealth to be counted as potential income of the remarried parent. We therefore affirm the superior court's order denying Glenn Miller's attempts to pursue this theory through motions for discovery and modification of his child-support obligation. We also affirm the superior court's order denying Marian Clough's motion for attorney's fees. But we remand the case with directions to correct three inaccuracies in the method used to calculate the parties' support.

# II. FACTS AND PROCEEDINGS

Glenn Miller and Marian Clough divorced in 2001 and shared equal custody of their children. In January 2002 the superior court ordered Glenn to pay $356.38 per month in child support. In calculating the amount of this award, the court determined that Marian was voluntarily underemployed; it imputed potential annual earnings to her of $52,700. In August 2002 Marian married John Clough. Glenn did not remarry but has lived with another woman since August 2003.

In late 2004 the parties' eighteen-year-old daughter Gwenn began living with Glenn full-time. Soon after, Glenn filed a pro se motion to modify the original custody order by awarding full custody of Gwenn to him; he also moved for a corresponding change in his child-support obligation.

In early 2005 Glenn—now represented by counsel—filed a second motion to modify

child support, arguing that his support obligation should be modified not just because Gwenn was living with him but also because Marian "should have additional income assigned to her by reason of her re-marriage to a wealthy second husband." According to Glenn, Marian's marriage to Clough gave her access to her new spouse's wealth and income, so the new income should be imputed as potential income available to Marian, who remained underemployed. In his reply to Marian's opposition, Glenn further asked the court for discovery of the Cloughs' household income, seeking production of their last three federal income tax and trust returns as well as permission to depose the Cloughs concerning their income and assets.

After hearing oral argument by the parties, Superior Court Judge Patricia A. Collins issued an oral decision on the record on March 17, 2005. The judge began by noting that Glenn had effectively withdrawn his motion seeking custody of Gwenn by acknowledging in reply to Marian's opposition to that motion that the court no longer had jurisdiction over Gwenn's custody, since Gwenn had already turned eighteen and was no longer a minor.

Judge Collins next addressed Glenn's motion to impute potential income to Marian based on her new spouse's wealth. The judge first determined that Marian's remarriage did not qualify as a changed circumstance warranting modification. Because potential income had already been imputed to Marian under Rule 90.3(a)(4) before she remarried, the judge ruled that her remarriage did not by itself justify a reexamination of her potential income.

The judge nonetheless observed that the support award might still be modified under Rule 90.3(c)'s provision allowing courts to deviate from the amount of support required under Rule 90.3(a) "if unusual circumstances would make an award under [Rule 90.3(a)] unjust." But Judge Collins interpreted Rule 90.3(c)'s "unusual circumstances" exception narrowly, noting that the commentary on this exception emphasizes that a variance ordinarily will be justified only by "clear and convincing evidence that manifest injustice would result if the support award were not

varied."[1] The judge further pointed to commentary specifically stating that, although either party may attempt to show that unusual circumstances justifying a variance exist in a particular case, the income of a new spouse will not normally warrant a variation.[2] While acknowledging that the commentary also mentions that a parent who does not work because of a new spouse's income may be assigned potential income,[3] the judge interpreted this as a reference to Rule 90.3(a)(4)'s provisions governing unemployment and underemployment, not as a suggestion that a new spouse's income should routinely be deemed an unusual circumstance warranting a variance under Rule 90.3(c).

In the present case, potential annual income was already imputed to Marian under Rule 90.3(a)(4) in the original child-support order, which had been entered before Marian's remarriage. Judge Collins thus inquired whether Marian's new husband's wealth should be deemed to increase her imputed earning potential under Rule 90.3(a)(4). Because this rule directs courts to consider only "work history, qualifications and job opportunities" when determining how much potential income to impute to an underemployed parent,[4] the judge reasoned that a new spouse's wealth could not alter the calculation of imputed income under Rule 90.3(a)(4); rather, it could only be considered to decide whether potential income should be imputed—a decision that had already been made in Marian's case.

In Judge Collins's view, then, John Clough's wealth would justify reexamining the original child-support order only if Glenn could specifically show that Marian's access to the wealth increased her actual income or required a variance from the amount of support originally ordered to avoid manifest injustice. Relying on this interpretation, Judge Collins rejected Glenn's "core argument" that John Clough's income should be deemed to enhance Marian's potential earnings, finding this argument to be inconsistent with Rule 90.3 and its commentary. In the court's view, Glenn had not "remotely established a prima facie case that unusual circumstances would make application of the 90.3(a)(4) formula," as reflected in the 2001 child-support calculations, manifestly unjust.

Judge Collins went on to consider whether Glenn was entitled to an order allowing him to pursue discovery of John Clough's income in order to develop a more persuasive "unusual circumstances" argument. Given the intrusive nature of the discovery request and the fact that it implicated the privacy rights of a person who had no child-support obligation, the judge suggested that, as a general matter, some threshold showing of actual need should be required before discovery of this kind would be allowed. At a minimum, the judge noted, she would be willing to consider allowing such discovery only if both parties agreed to provide income information concerning their domestic partners.

Judge Collins then addressed the specifics of Glenn's request for discovery of Clough's financial information. Given her ruling that the information had no direct bearing on the method for calculating Marian's potential income under Rule 90.3(a)(4), the court focused on whether discovery should be allowed to assist Glenn in determining whether unusual circumstances warranted modification under Rule 90.3(c). The judge noted that the court did not have a "specific request before [it]" addressing this theory and was therefore unable to rule on the issue. Judge Collins nonetheless encouraged counsel for both parties to "work out some mutually agreeable discovery method" for exploring a possible claim of unusual circumstances under Rule 90.3(c), noting that Glenn could file an "appropriate motion" if the parties were unable to settle any discovery disputes on their own.

Judge Collins then briefly addressed the only modification request that remained unresolved: Glenn's motion to modify support in light of Gwenn's changed living arrangement. The judge began by advising the parties that, as matters then stood, she did not expect to award attorney's fees to either side

---

**1.** Alaska R. Civ. P. 90.3 cmt. VI(A).

**2.** *Id.* cmt. VI(B)(5).

**3.** *Id.*

**4.** Alaska R. Civ. P. 90.3(a)(4).

for work done to that point. The judge then invited each party to submit proposed recalculations of support reflecting Gwenn's new living arrangements.

Several days after entering her oral decision, Judge Collins issued a written order supplementing her on-record ruling. The order confirmed that the court had deemed Glenn to have withdrawn his motion for custody of Gwenn because she was no longer a minor. It also determined that Marian's remarriage to John Clough did not by itself "establish exceptional circumstances warranting departure from the Rule 90.3(a)(4) support calculation employed by [the] court in calculating support in 2001." Last, the order ruled that the parties' support obligations would be recalculated in light of Gwenn's move to her father's home.

Glenn moved for clarification and asked the court to set aside the order's effective date pending discovery of the Cloughs' household income. Glenn's motion asserted that, despite its refusal to impute household income to Marian, the court had allowed discovery of the Cloughs' income tax records and other documents. Marian opposed Glenn's motion, arguing that "there was no discovery issue properly before the court and none was decided" and that "the court has ruled that the fact that Marian Clough has married the man she was cohabiting with in 2001 does not establish exceptional circumstances warranting departure from the support calculation employed by the court in 2001."

Glenn then filed a motion for discovery, asking the court to authorize disclosure of various financial records that he had requested from the Cloughs, including copies of their federal income tax and trust income tax returns for 2004 and copies of any separation agreement, prenuptial agreement, or postnuptial agreement between them. Glenn asserted that he had "requested this discovery under Civil Rule 90.3(c)(1)[ ] [the 'unusual circumstances' exception to Rule 90.3(a) ] in order that household income of the Cloughs

should be considered in setting current child support." Glenn's motion also disclosed that "Mr. Miller's significant other, Joan Thompson, provided a copy of her current year-to-date pay statement and her 2004 federal income tax return" to the Cloughs. The motion claimed that in its oral decision, the court had "opined that it would allow discovery but insisted that it should be reciprocal."

In response to Glenn's motion for clarification, Judge Collins issued an order making it clear that, in the judge's view, no discovery motion was pending before the court and the court had not refused to impute income to Marian. Judge Collins summarized the status of the case as follows:

> The court did impute income to Ms. Clough in 2001. The court did reject Mr. Miller's argument that a new spouse's income should always be *added* to the obligor parent's income (or imputed income, as here) to determine child support and that remarriage, standing alone, is a significant change in circumstance. The court indicated that Mr. Miller is free to conduct discovery to determine if Ms. Clough derives any income now that is greater than that which was imputed to her in the 2001 order.

By separate order, Judge Collins denied Glenn's motion for an order authorizing discovery of the Cloughs' financial records, ruling that Glenn's "motion for discovery is, at best, premature"; the order nonetheless noted that Glenn remained free to make an informal request for this information under Civil Rule 90.3(e)(2)—a provision authorizing parties involved in child-support proceedings to informally request and obtain financial information from each other.[5]

Meanwhile, both Glenn and Marian had submitted child-support affidavits and worksheets setting out their proposed recalculations of child support based on Gwenn's change of residency. The parties' proposals differed as to the proper amount of deductions to be used in determining the parties' adjusted annual incomes. The superior court

---

5. Civil Rule 90.3(e)(2) provides in part:
 While there is an ongoing monthly support obligation, either party must provide to the other party, within 30 days of a written re-quest, documents such as tax returns and pay stubs showing the party's income for the prior calendar year.

ultimately accepted Marian's proposed calculations, which resulted in an order requiring Glenn to pay Marian $37 per month for March, April, and May 2005 (the period from the date of the order until Gwenn's graduation from school terminated the parties' duty of support); after that, Glenn was to pay Marian $504 per month for the two children remaining with her.

Marian then moved for attorney's fees, arguing that she was the prevailing party because Glenn had filed at least seven separate motions seeking to reduce his child-support obligation, all of which had been denied or struck. Marian also claimed that she deserved an enhancement of her fee award under Civil Rule 82(b)(3), alleging that Glenn had failed to minimize his fees, had pursued unreasonable claims, and had engaged in vexatious and bad faith conduct.

The superior court denied Marian's motion, noting that both parties had "prevailed on certain aspects of the support dispute"—Marian on "important support-related issues, including whether remarriage automatically requires recalculation of child support," and Glenn on his request to lower his child-support obligation in light of Gwenn's decision to live full-time with him.

Both parties appeal.

## III. DISCUSSION

### A. Glenn's Appeal

#### 1. Refusal to impute income to Marian based on her new spouse's wealth

 Glenn argues that the superior court erred in declining to consider the wealth of Marian's new spouse in calculating her child-support obligation. He relies chiefly on Rule 90.3(a)(4), which allows courts to impute potential income to an unemployed or underemployed parent:

The court may calculate child support based on a determination of the potential income of a parent who voluntarily and unreasonably is unemployed or underemployed. A determination of potential income may not be made for a parent who is physically or mentally incapacitated, or who is caring for a child under two years of age to whom the parents owe a joint legal responsibility. Potential income will be based upon the parent's work history, qualifications, and job opportunities. The court also may impute potential income for non-income or low income producing assets.[6]

 As previously mentioned, the superior court keyed on the language in this provision that directs courts to base their calculation of potential income "upon the parent's work history, qualifications, and job opportunities."[7] Glenn insists that the court interpreted this language too narrowly, contending that the court should have considered the totality of the circumstances in deciding how much potential income should be imputed to Marian.[8]

Glenn points out that in 2002, before Marian remarried, the superior court determined that she was voluntarily underemployed and had the ability to earn a potential annual income of $52,700. Glenn further notes that by 2005, when Glenn moved to modify child support, Marian was married to John Clough and continued to be underemployed. In Glenn's view, Marian's situation had changed because her new spouse is a person of "significant income and wealth," which, according to Glenn, enables Marian to enjoy an "affluent lifestyle." Given these circumstances, Glenn reasons, Clough's wealth must be regarded as a factor enhancing Marian's potential income under Rule 90.3.

Glenn bolsters this argument by citing our decision in *Beaudoin v. Beaudoin,*[9] as well as the commentary to Rule 90.3.[10] In *Beau-*

6. Alaska R. Civ. P. 90.3(a)(4).

7. *Id.*

8. The superior court's interpretation of the civil rules presents a question of law that we review de novo. *Fuller v. City of Homer,* 113 P.3d 659, 662 (Alaska 2005).

9. *Beaudoin v. Beaudoin,* 24 P.3d 523 (Alaska 2001).

10. The commentary to Civil Rule 90.3 has not been officially adopted, but it can provide useful guidance in applying the rule. *See Caldwell v. State,* 105 P.3d 570, 573 n. 6 (Alaska 2005).

*doin,* we noted that both Rule 90.3(a)(4) and "our case law specifically require courts to consider the 'totality of the circumstances' to decide whether income should be imputed." [11] In making this point, *Beaudoin* referred to the commentary to Rule 90.3(a)(4), which observes that "[t]he court shall consider the totality of the circumstances in deciding whether to impute income." [12]

Glenn further points to the commentary to Rule 90.3(c)(1)—the "unusual circumstances" exception—noting that the commentary expressly recognizes that "[a] parent who does not work because of the income of a new spouse (or other person in the household) may be assigned a potential income." [13] In addition, Glenn cites case law from other states.[14] Glenn claims that, because "Marian Clough's imputed annual income of $52,700 is belied by her affluent lifestyle," the superior court abused its discretion in failing to "examine how Marian actually lives and her actual expenditures" since she remarried.

In response, Marian rejects Glenn's claim that the superior court refused to consider her potential income under Rule 90.3(a)(4), insisting that the court properly applied this rule in the original child-support order by imputing annual income to her of $52,700. Marian describes Glenn's proposed "totality of the circumstances" approach to Rule 90.3(a)(4) as "fundamentally inconsistent with Alaska law." Pointing to the plain language of Rule 90.3(a)(4) and case law applying the provision, Marian argues that "Alaska courts have uniformly upheld the principle that the earning potential of the *parent* must be the basis for any child support award."

We agree with Marian's understanding of Rule 90.3. The plain language of Rule 90.3(a)(4) unambiguously directs that "[p]otential income *will* be based upon the parent's work history, qualifications, and job opportunities." [15] This language does not recognize any other permissible criteria to be used in calculating the amount of potential income to be imputed to an unemployed or underemployed parent under Rule 90.3(a)(4). Nor does the commentary to Rule 90.3 advance Glenn's "totality of the circumstances" theory. The commentary to Rule 90.3(a)(4) confirms the rule's express language declaring that work history and other related criteria "will be" the basis for calculating potential income.[16] The same commentary also observes that courts should consider "the totality of the circumstances in deciding *whether* to impute income." [17] But this observation addresses only the manner in which they should make the threshold decision whether to impute potential income to an underemployed parent, not the manner in which they should determine the amount of potential income to impute once the initial decision to impute has been made. In effect, then, as Judge Collins correctly recognized, this commentary directs courts to the language of Rule 90.3(a)(4) for purposes of deciding how much potential income to impute.

*Beaudoin v. Beaudoin* aligns with this view. There, we were required to decide whether potential income should be imputed to a parent who had previously been her children's primary caregiver and had never held a paying job.[18] We applied the totality of the circumstances approach to decide this threshold issue.[19] We did not suggest that the totality of the circumstances approach

**11.** *Beaudoin,* 24 P.3d at 528 (quoting Alaska R. Civ. P. 90.3 cmt. III(C)).

**12.** Alaska R. Civ. P. 90.3 cmt. III(C).

**13.** Alaska R. Civ. P. 90.3 cmt. VI(B)(5).

**14.** For example, the Washington Court of Appeals, applying a Washington statute, has recognized that although a new spouse's income cannot itself be included in calculating a divorced parent's gross income for child support purposes, half the new spouse's taxable capital gains, interest and dividend income must be imputed to the parent under the presumption that

property acquired during a marriage is community property absent clear and convincing evidence to the contrary. *See In re Marriage of Scanlon,* 109 Wash.App. 167, 34 P.3d 877, 883 (2001) (applying Wash. Rev.Code § 26.19.071(3)).

**15.** Alaska R. Civ. P. 90.3(a)(4) (emphasis added).

**16.** Alaska R. Civ. P. 90.3 cmt. III(C).

**17.** *Id.* (emphasis added).

**18.** *Beaudoin,* 24 P.3d at 524.

**19.** *Id.* at 528.

could be applied in determining the amount of an underemployed parent's potential income once the decision to impute had been made.

Here, the superior court properly determined that Glenn had failed to establish grounds for imputing more potential income to Marian than the court had already found appropriate in 2001. On this point, Glenn essentially claimed that Marian's remarriage to a wealthy person amounted to a prima facie showing that Marian's potential income had increased. But in our judgment, the superior court properly concluded that the language of Rule 90.3(a)(4) bars direct reliance on a new spouse's wealth as evidence of increased earning potential.

The court also correctly recognized that Glenn could have—but had not—moved to modify his support on the ground that Clough's wealth resulted in unusual circumstances justifying a variance under Rule 90.3(c)(1). While Glenn's discovery motion belatedly mentioned this theory, it inaccurately claimed that the theory had been raised in his earlier motion for modification. Actually, Glenn had previously disclaimed reliance on the unusual circumstances exception. Indeed, during the March 17, 2005, proceeding in which Judge Collins issued her on-record denial of Glenn's motion for modification, Glenn expressly stated that his motion was based exclusively on the potential income language of Rule 90.3(a)(4).

Because the superior court correctly interpreted Rule 90.3(a)(4) to bar direct consideration of a new spouse's wealth as a basis for determining the amount of potential income to impute to a remarried parent and also correctly recognized that Glenn's earlier motion sought modification solely on this basis,

we conclude that the court did not err in denying Glenn's motion to modify support in light of Marian's remarriage to Clough.

### 2. Denial of Glenn's motion for discovery

Glenn separately argues that the superior court erred in denying his discovery motion. He claims that he was entitled to discovery both under Civil Rule 26(b)(1), which generally allows discovery of any relevant information,[20] and under Rule 90.3(e), which specifically requires parties to a child-support proceeding to produce statements of income with verifying documentation.[21] Glenn asserts that he was entitled to this discovery in order to pursue an argument under Rule 90.3(c)(1) that unusual circumstances justified varying Marian's imputed income as originally determined under Rule 90.3(a)(4).[22]

As we have seen, however, Glenn did not move to modify his support on this basis, and, indeed, before moving for discovery on this theory, he had disavowed reliance on Rule 90.3(c)(1)'s unusual circumstances exception. Given these circumstances, the superior court did not abuse its discretion in declining to allow Glenn to raise this new theory in the proceedings involving Glenn's pending motion for modification after the court had already ruled on and correctly denied that motion under the theory that Glenn had originally pled. As the superior court observed in refusing to order discovery, Glenn's motion for discovery on this unpled theory was "at best, premature."[23] We thus uphold the superior court's discovery ruling.

20. Alaska R. Civ. P. 26(b)(1).

21. Alaska R. Civ. P. 90.3(e).

22. We review the superior court's discovery rulings for an abuse of discretion, and will not reverse unless, after reviewing the entire record, we are convinced that the court erred. *Willoya v. State, Dep't of Corr.*, 53 P.3d 1115, 1119 (Alaska 2002).

23. We reject Glenn's effort to characterize the trial court's comments concerning reciprocal discovery of household income as an implied promise to grant Glenn discovery of the Cloughs' financial records if Glenn voluntarily disclosed his own household financial information. In our view, a fair reading of the record makes it clear that Judge Collins intended her comments as a description of a threshold condition that the judge would likely have imposed before approving discovery if Glenn had properly raised the unusual circumstances theory in his motion for modification and had then moved for discovery after exhausting informal discovery procedures prescribed by the rules.

### 3. Disputed items of adjusted annual income

■ Although the superior court denied Glenn's motion to modify child support on the basis of Marian's new spouse's wealth, it granted his separate motion to modify support because of Gwenn's decision to live in Glenn's home. The court directed the parties to submit proposed child-support calculations reflecting this change. In May 2005, after both parties filed DR–305 child-support worksheets and affidavits, the court issued a modified support order adopting Marian's figures. Glenn challenges three items in the superior court's calculations of the parties' adjusted annual income, all of which the court derived from Marian's worksheets.[24]

### a. Glenn's income tax liability

■ Glenn first contends that the superior court underestimated his annual federal tax liability by adopting Marian's figures. Marian's child-support worksheet projected Glenn's 2005 federal income tax liability from the estimated taxes withheld from his January 2005 earnings. This method yielded an annual tax liability of $3,311. By contrast, Glenn's child-support worksheet used the taxes Glenn had actually paid on the similar wages in 2004; this resulted in a projected tax liability of $4,780.

Glenn asserts that his withheld taxes underestimated his actual tax liability because he was under-withholding and that the taxes he actually paid in 2004 provide the most accurate basis for estimating his 2005 taxes. Because the record provides no indication that his tax liability would substantially decline in 2005, Glenn reasons that the court should have used his proposed calculations.

In support of his argument, Glenn cites *Bergstrom v. Lindback*.[25] In *Bergstrom* the superior court used withholding figures instead of actual income tax liability to calculate Bergstrom's adjusted annual income for purposes of determining his child-support obligation.[26] We reversed, ruling that the court should have relied on Bergstrom's history of actual tax payments:

> The amount of taxes withheld by an employer may or may not reflect a taxpayer's actual tax liability. Although Civil Rule 90.3(a)(1)(A) refers to "mandatory deductions" for federal income tax, we believe that Bergstrom's actual tax liability under existing Internal Revenue Service regulations, rather than the amount withheld, is the proper basis for determining the amount to be deducted from his income. Therefore, the trial court erred in reducing [Bergstrom's] adjusted annual income by the amount withheld rather than his actual tax liability.[27]

Marian does not dispute the accuracy of Glenn's 2004 tax liability as a predictor of his future liability; instead, she contends that it was not clearly erroneous for the superior court to find that Glenn's "paycheck tax withholdings were an acceptable measure of his 2005 tax liability." Marian points to a footnote in *Bergstrom* in which we described evidence presented at trial indicating that Bergstrom's employer had made an error in calculating the amount of taxes withheld from his wages.[28] Marian suggests that our ruling in *Bergstrom* hinged on this evidence, and did not establish a general rule disfavoring use of withheld taxes as an acceptable measure of future tax liability.

We disagree with Marian's narrow reading of *Bergstrom*. Our decision in *Bergstrom* recognized that "[t]he amount of taxes withheld by an employer *may or may not* reflect

---

24. We will reverse the superior court's child-support order only if the court abused its discretion or applied an incorrect legal standard. Whether the court used the correct method of calculating child support is a matter of law that we review de novo. *Caldwell*, 105 P.3d at 573 (citing *Turinsky v. Long*, 910 P.2d 590, 593 n. 10 (Alaska 1996)). But we review a trial court's factual findings used to determine child support under the clearly erroneous standard. *Id.* (citing *Routh v. Andreassen*, 19 P.3d 593, 595 (Alaska 2001)).

25. *Bergstrom v. Lindback*, 779 P.2d 1235 (Alaska 1989).

26. *Bergstrom*, 779 P.2d at 1236.

27. *Id.* at 1236–37 (footnote omitted).

28. *Id.* at 1237 n. 5.

a taxpayer's actual tax liability."[29] Given the general unreliability of withholding, we declared that "actual tax liability under existing Internal Revenue Service regulations, rather than the amount withheld, is the proper basis for determining the amount to be deducted from [Bergstrom's] income."[30]

Here, Glenn provided the superior court with his actual tax liability on comparable wages for 2004, along with rate schedules for his income level and taxpayer status. Marian provided no information indicating that Glenn's actual 2004 tax liability would not accurately approximate his current and future tax liabilities. Given these circumstances, we conclude that *Bergstrom* required Glenn's actual tax liability for 2004 to be used because it was the most accurate available indicator of his actual liability in the future.

### b. Glenn's retirement deduction

■ Glenn argues next that the superior court undercounted his retirement deduction by disallowing his claimed deductions for contributions to a voluntary retirement plan. In his child-support worksheet, Glenn listed mandatory and voluntary annual contributions totaling $3,927. Marian's worksheets credited Glenn only for a $519 mandatory retirement deduction. Glenn insists that Rule 90.3(a)(1)(B) entitled him to a "combination mandatory/voluntary retirement deduction of 7.5% of his gross income."

Marian acknowledges that she credited Glenn only for his mandatory contribution. But she insists that this credit was correct under the version of Rule 90.3 in effect when she filed her proposed child-support calcula-

tions in April 2005. Marian's argument is accurate in a technical sense but lacks substantive merit.

It is true that on April 7, 2005, when Marian filed her proposed child-support worksheets, Rule 90.3(a)(1)(A) provided that "voluntary tax-deferred contributions to a qualified retirement or pension plan or account up to 7.5% of the parent's gross income" could be deducted "if the parent is not a participant in a mandatory retirement plan."[31] This phrasing implied that a parent could not claim credits for both voluntary and mandatory contributions. But in February 2005, this court had issued an order amending the rule to resolve this ambiguity in favor of allowing combined credits. Our order provided that the amended version would take effect on April 15, 2005—eight days after Marian filed her worksheets.[32] Because the amended rule was in effect when the superior court issued its May 1, 2005, order modifying the parties' support, the amended rule allowing a combined deduction applied to this case.

### c. Marian's income tax liability

■ Glenn last contends that the superior court overestimated Marian's income-tax liabilities. In her worksheets, Marian assigned herself a tax liability of $6,260 on her imputed income of $52,700. This $6,260 hypothetical liability was identical to the figure agreed upon by the parties and approved by the court in 2002 when it issued the original child-support order. Glenn's 2005 child-support worksheets proposed to assign Marian a lower tax liability, $4,556, a figure Glenn calculated using 2005 IRS tax tables. Glenn argues that this updated calculation is

29. *Id.* at 1236 (emphasis added).

30. *Id.*

31. *See* Alaska Supreme Court Order No. 1526 (Apr. 15, 2005).

32. The amended version of the rule eliminated the original language that seemingly allowed a deduction for voluntary retirement contributions *only* if the claimant did not participate in a mandatory plan. According to the Child Support Guidelines Committee commentary, under Rule 90.3's new language,

Mandatory retirement contributions are a deduction. Voluntary contributions, up to the limit stated in the rule, are also a deduction if the earnings on the retirement account or plan are tax-free or tax-deferred. If a parent is *not* a participant in a mandatory plan, the limit on voluntary contributions is 7.5% of gross wages and self-employment income. If a parent is a participant in a mandatory plan, the limit on voluntary contributions is 7.5% of gross wages and self-employment income minus the amount of the mandatory contribution.

Attachment to Alaska Supreme Court Order No. 1526 (Apr. 15, 2005)—Commentary to Civil Rule 90.3(III)(D).

more accurate and thus should have been used instead of the original hypothetical figure, which, in his view, had "no factual basis."

In response, Marian points out that all of the original figures used in connection with her imputed potential income were necessarily hypothetical; because Glenn agreed with this hypothetical tax liability in 2001 and urged the court to adopt it, she contends, it is too late for him to change the figure now. But Marian's argument places form over substance. In effect, it proposes to establish a rule that would lock all future tax consequences of imputed potential income to consequences existing at the time of original imputation. Such a rule would conflict with basic principles of fairness requiring tax-support calculations to be as accurate as reasonably possible.

Marian does not dispute that calculating her tax liabilities using the tax provisions applicable in 2002 produces an outdated result. Yet she identifies no sound reason why the outdated information should be acceptable in the modified order if it would not have been in the original order. We thus conclude that Marian's ongoing tax liability must be calculated using currently applicable tax tables.

## B. Marian's Appeal

▬▬▬ At the conclusion of its oral decision denying Glenn's motion to impute income to Marian based on her new spouse's wealth, the superior court briefly commented that, as matters then stood, it would not expect to award fees to either side. After the court entered its modified child-support order adopting Marian's proposed calculations, Marian moved for an award of attorney's fees under Rule 82. Marian now appeals the superior court's denial of her motion, arguing that the court improperly prejudged the issue in its on-record comments and that, in any event, she deserved to be awarded fees because she was clearly the prevailing party.[33]

At the outset, Marian suggests that, in its on-record remarks, the court prematurely ruled out an award of attorney's fees because it wanted to "push the parties towards settlement." But in our view, Marian's argument casts an unreasonably harsh light on the superior court's comments. At the March 17, 2005, proceeding, Judge Collins stated:

> [A]t this point, I can advise that I do not anticipate that I'm going to award either side costs and attorney's fees for anything that's been done to date.... I guess I'm just really concerned that we're looking at the potential for the dispute to cost more than the child support. And while that's a factor for the parties to consider as opposed to me, I think it's only fair to give that that level of notice.... So, I mean, I encourage you all—I realize that it hasn't been successful to date, but to see if some agreement can be reached on that point.

On their face, these remarks simply informed the parties of the court's impression that the proceedings so far had been disproportionately contentious and that both parties might be well advised to explore the possibility of settling amicably. Because these remarks described impressions formed by the court in the course of the present litigation, they cannot reasonably be seen as expressing bias; instead, they candidly expressed legitimate concerns held by the court at the time. Nor do the remarks communicate any trace of a threat or hint of coercion; they merely give the parties candid and fair notice of the court's view of the case at the time and urge them to consider the alternative of resolving the remaining issues in the case by a mutually acceptable agreement. Viewing the remarks in context, we fail to see any error.

▬▬▬ Marian also challenges the superior court's ultimate denial of her motion for fees on the ground that the ruling was "manifestly unreasonable" because she had prevailed on all of the substantive issues, whereas

---

**33.** We review the superior court's prevailing-party determination in an attorney's-fees dispute for abuse of discretion. *Interior Cabaret, Hotel, Rest. & Retailers Ass'n v. Fairbanks N. Star Borough,* 135 P.3d 1000, 1002 (Alaska 2006). Prevailing-party determinations are ordinarily overturned only if they are manifestly unreasonable. *Jerue v. Millett,* 66 P.3d 736, 740 (Alaska 2003).

Glenn prevailed only in winning a temporary reduction of his child-support obligation. Marian likens her case to *DeWitt v. Liberty Leasing Co.*,[34] where one party recovered a judgment of $17,736.11 against an opponent who won an offset claim of $93.64;[35] on appeal, we reversed a trial court order that refused to declare a prevailing party for purposes of awarding fees, holding that the plaintiff had clearly prevailed.[36]

But the circumstances here are distinguishable from those in *DeWitt*. *DeWitt* merely involved a single claim for money that was offset by a minimal counterclaim. In contrast, Glenn litigated two legally and factually distinct motions to modify child support: one sought a change reflecting his oldest daughter's decision to live with him; the other sought to impute potential income to Marian based on her new spouse's wealth. On the first issue, despite Marian's active opposition, the superior court granted Glenn's motion and recalculated support.[37] On the second issue, Marian prevailed, blocking Glenn's efforts to obtain discovery and modify support based on John Clough's income. Given that each party prevailed on non-overlapping claims, it was not manifestly unreasonable for the superior court to determine that neither party was the "prevailing party" for purposes of awarding fees under Rule 82.[38]

## IV. CONCLUSION

We AFFIRM the superior court's orders declining to impute potential income to Marian on the basis of her new spouse's wealth and refusing to approve discovery to Glenn on this point. We VACATE and REMAND for recalculation consistent with this opinion the three items in the modified support order using inaccurate figures submitted by Marian. We AFFIRM the superior court's denial of Marian's motion for Rule 82 fees.

CARPENETI, Justice, not participating.

---

**34.** *DeWitt v. Liberty Leasing Co. of Alaska,* 499 P.2d 599 (Alaska 1972).

**35.** *Id.* at 600.

**36.** *Id.* at 602.

**37.** Glenn's success on the computational issues addressed in this appeal reinforces his prevailing-party status on this first motion for modification.

**38.** Because we affirm the superior court's denial of attorney's fees to Marian, we do not need to decide whether Marian would have been entitled to enhanced fees if the court had awarded fees.